HILL, J.:
**227 Convicted by a jury of murder and desecration of human remains, Fabian Lamichael R. Green appeals, challenging the trial court's admission of a series of direct messages from the victim's Facebook account into evidence and the denial of his motion for a mistrial due to a bailiff's comments to a juror. Because we conclude the Facebook messages were properly authenticated and the bailiff's misconduct did not affect the impartiality of the jury, we affirm.
I.
On the late afternoon of May 8, 2016, seventeen-year-old Edwin Diaz Charinos (Victim) left his parents' home driving a Ford Mustang and never returned. After his family filed a missing persons report, police reviewed direct messages Victim's father-who had his son's password-discovered on Victim's Facebook page. The messages were exchanged on May 7 and the afternoon of May 8 and appeared to be between Victim and a user named "Ruby Rina." Among other things, the messages revealed Ruby Rina invited Victim to her home at 108 Queens *713 Circle in Laurens on the afternoon of May 8 for a sexual rendezvous. After reviewing the messages, officers visited 108 Queens Circle and looked for Victim's car to no avail.
On May 26, a landscaper disposing of hedge clippings in woods off Taylor Road in Clinton discovered a Ford Mustang with its doors open and what appeared to be burned human remains beside it. The landscaper called 911 and responding officers processed the scene. Investigators also returned to 108 Queens Circle, where they encountered Green and Karina Galarza, Green's sometime girlfriend. Based on discussions with Galarza, investigators obtained arrest warrants for her and Green. A search of the residence revealed blood stains and other physical evidence. Davian Holman, Green's cousin, was also identified as a suspect. He was later apprehended after being found by police asleep under Galarza's bed at the **228 Queens Circle residence. Green, Galarza, and Holman were all charged with Victim's murder.
At Green's trial, expert evidence demonstrated the remains found in the woods matched Victim's DNA. Forensic testing conducted on a blood stain taken from 108 Queens Circle determined the odds were one in thirty-eight quadrillion that the blood belonged to someone other than Victim. The State also introduced a piece of bedding found where Victim's remains were located that appeared to be identical to bedding collected from Galarza's home.
Holman testified Galarza's Facebook name was "Ruby Rina." He stated the morning of May 8, 2016, he was at Galarza's home at 108 Queens Circle with Green and Galarza. Holman explained Green and Galarza were laughing while texting, but he could not see the screens of the cell phones and did not know who they were messaging. Later that afternoon, Victim arrived at Galarza's home. When Victim tried to leave, Holman witnessed Galarza push Victim towards her sister's room. Green then emerged from the sister's room and struck Victim several times in the head with a hammer. Green told Holman to help him move Victim's body, which had been wrapped in bedding, into the backseat of Victim's Mustang. They drove Victim's car to the location off Taylor Road where Victim's remains were found. Holman stated Green removed Victim's body and a bucket with lighter fluid from the car. Holman testified he walked away from the car while Green sprayed the lighter fluid, so he did not see what happened to Victim's body, but he smelled smoke.
An acquaintance of Green's who lived in Clinton testified Green and Holman walked up to his house around 9:00 or 10:00 p.m. on the night of May 8, 2016. The acquaintance stated Green was carrying a bucket and looking for lighter fluid or alcohol. An autopsy found Victim's death was caused by blunt force trauma to the head, resulting from seven blows to the head with a flat, circular object consistent with the head of a hammer.
Over Green's hearsay and authentication objections, the trial court admitted printouts of the Facebook messages into evidence. The State also presented a letter Green wrote while in jail awaiting trial. In the letter, Green admitted he and "his **229 girl" used Facebook messages to lure Victim to Galarza's home where Green hit him in the head with a hammer. Green testified the letter was false, and he had written it to intimidate inmates who had been bullying him.
After the jury deliberated for close to four hours, the trial court was alerted to questionable contact between a bailiff and a juror. While the trial court conferred with counsel about the contact, the jury reached a verdict. The trial court received the verdict in open court and sent the jury back to the jury room. The trial court then brought each juror out separately for individual questioning on the record. All denied any improper conversation with the bailiff. Bailiff Johnny Bolt testified a juror had asked him what would happen in the event of a deadlock, and he responded the judge would likely give them an Allen[1] charge and ask if they could stay later.
Green moved for a mistrial, asserting the bailiff's comments improperly influenced the jury. The trial court denied Green's motion and sentenced him to forty-five years' imprisonment *714 on the murder charge and ten years' imprisonment on the desecration of human remains charge.
II.
We first take up Green's challenge to the admission of the Facebook messages. Green does not appeal the trial court's ruling that the messages were co-conspirator statements and, therefore, not hearsay. Instead, he zeroes in on the trial court's ruling that the messages were properly authenticated, claiming there was not enough proof to support such a finding. We review evidentiary rulings to see whether the trial court abused its discretion, meaning the ruling was based on an error of law or lacked evidence to support it. See State v. Byers , 392 S.C. 438, 444, 710 S.E.2d 55, 57-58 (2011).
A. The Requirement of Authentication
All evidence must be authenticated. State v. Brown , 424 S.C. 479, 488, 818 S.E.2d 735, 740 (2018) ; 2 McCormick On Evid. § 221 (7th ed. 2016) ("[I]n all jurisdictions the requirement **230 of authentication applies to all tangible and demonstrative exhibits."). Authentication is a subspecies of relevance, for something that cannot be connected to the case carries no probative force. The trial judge acts as the authentication gatekeeper, and a party may open the gate by laying a foundation from which a reasonable juror could find the evidence is what the party claims. Rule 901(a), SCRE ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). The authentication standard is not high, Deep Keel, LLC v. Atlantic Private Equity Group., LLC , 413 S.C. 58, 64-65, 773 S.E.2d 607, 610 (Ct. App. 2015), and a party need not rule out any possibility the evidence is not authentic. In the realm of authentication, the law, like science, is content with probabilities.
The court decides whether a reasonable jury could find the evidence authentic; therefore, the proponent need only make "a prima facie showing that the 'true author' is who the proponent claims it to be." United States v. Davis , 918 F.3d 397, 402 (4th Cir. 2019). Once the trial court determines the prima facie showing has been met, the evidence is admitted, and the jury decides whether to accept the evidence as genuine and, if so, what weight it carries. Rule 104(b), SCRE ; see United States v. Branch , 970 F.2d 1368, 1370-72 (4th Cir. 1992) ; 5 Weinstein et al., Weinstein's Federal Evidence § 901.02[3] (2d ed. 2019).
Green argues the State's authentication showing fell short. He points to the potential that social media can be manipulated and the ease with which a hacker could access another's account or create a fictitious account. Green notes neither the sender nor the recipient of the messages corroborated they were authentic, and there was evidence both accounts were not secure.
Social media messages and other content may appear to pose unique authentication problems, but these problems dissolve against the framework of Rule 901, SCRE. Social media messages and content are writings, and evidence law has always viewed the authorship of writings with a skeptical eye. See 2 McCormick On Evidence § 221 (evidence law does not **231 assume authorship of a writing, "[i]nstead it adopts the position that the purported signature or recital of authorship on the face of a writing is not sufficient proof of authenticity to secure the admission of the writing into evidence").
The requirement of authentication cannot be met by merely offering the writing on its own. See Williams v. Milling-Nelson Motors, Inc. , 209 S.C. 407, 410, 40 S.E.2d 633, 634 (1946). Something more must be set forth connecting the writing to the person the proponent claims the author to be. Rule 901, SCRE, does not care what form the writing takes, be it a letter, a telegram, a postcard, a fax, an email, a text, graffiti, a billboard, or a Facebook message. All that matters is whether it can be authenticated, for the rule was put in place to deter fraud. 2 McCormick On Evidence § 221. The vulnerability of the written word to fraud did not begin with the arrival of the internet, for history has shown a quill pen can forge as easily as a keystroke, letterhead stationery can be stolen or manipulated, documents can *715 be tricked up, and telegrams can be sent by posers. Viewed against this history, the argument that social media should bear a heavier authentication burden because such a "modern" medium is particularly vulnerable to fraudsters may be seen for what it is: old wine in a new bottle.
B. Rule 901(b)(1), SCRE : Authentication by Personal Knowledge
Rule 901(b), SCRE, lists ten non-exclusive methods of authentication. The first method is the easiest and most direct way to authenticate a writing: having someone with personal knowledge about the writing testify the matter is what it is claimed to be. Rule 901(b)(1), SCRE. This method may be accomplished by testimony from a person who sent or received the writing. Because it is the easiest method, it is also uncommon, for the sender and the recipient are often unavailable, as here. One who witnessed the creation or signing of the writing also has the personal knowledge Rule 901(b)(1), SCRE, demands. We cannot say Holman's observation of Green and Galarza texting, without more, meets Rule 901(b)(1), SCRE.
**232 C. Rule 901(b)(4), SCRE : Authentication by Circumstantial Evidence of Distinctive Characteristics
Most writings meet the authenticity test through Rule 901(b)(4), SCRE, which enables authentication to be proven by: "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Courts lag behind technology for good reason. As society adapts to the digital age, courts are growing more comfortable with using circumstantial evidence to authenticate social media content. 2 McCormick On Evidence § 227 ; 5 Mueller & Kirkpatrick, Federal Evidence § 9.9 (4th ed. 2018) (noting most common way to authenticate social media is by evidence of distinctive characteristics); see also Grimm, et al., Authentication of Social Media Evidence , 36 Am. J. Trial Advoc. 433, 469 (2013) ( Rule 901(b)(4) is "one of the most successful methods used to authenticate all evidence, including social media evidence").
Rule 901(b)(4), SCRE, meshes with prior South Carolina law, which has long endorsed authentication by circumstantial proof. See Kershaw Cty. Bd. of Educ. v. U.S. Gypsum Co. , 302 S.C. 390, 398, 396 S.E.2d 369, 373-74 (1990). As our supreme court explained in State v. Hightower , 221 S.C. 91, 105, 69 S.E.2d 363, 370 (1952) :
Like any other material fact, the genuineness of a letter may be established by circumstantial evidence if its tenor, subject-matter, and the parties between whom it purports to have passed make it fairly fit into an approved course of conduct, and manifests the probability that the subject-matter of its contents was known only to the apparent writer and the person to whom it was written ....
See also Singleton v. Bremar , 16 S.C.L. 201, 210 (Harp. 1824) (letter authenticated by reference to unique facts relating to writer "and her situation"). A writing may also be authenticated if it is made in reply to an earlier communication from a source known to be genuine. See Kershaw Cty. Bd. of Educ. , 302 S.C. at 398, 396 S.E.2d at 373-74 ; Leesville Mfg. Co. v. Morgan Wood & Iron Works , 75 S.C. 342, 344, 55 S.E. 768, 768-69 (1906) ; see also 7 Wigmore et al., Evidence in Trials at Common Law § 2153 at 753 (Chadbourn rev. ed. 1978). This **233 has been termed the "reply letter doctrine"-though today it might be better called the "reply email[2] doctrine."
We find the content of the messages was distinctive enough that a reasonable jury could find Galarza wrote them. Numerous facts link the Facebook messages to Galarza and, consequently, Green: the use of the screen name "Ruby Rina," which Holman testified was Galarza's; reference to "Julissa" on the messages, which testimony showed was Galarza's sister's name; Ruby Rina's invitation to her home, which she stated was at 108 Queens Circle; Victim's reference to Ruby Rina as "Karina," Galarza's real first name; comments throughout the messages about Ruby Rina's erstwhile boyfriend that were consistent with her relationship with Green; the timing of the messages; and the *716 tragic fact that Victim disappeared shortly after Ruby Rina invited him to 108 Queens Circle, where his blood was later discovered. Taken together, these circumstances serve as sufficient authentication to meet the low bar Rule 901(b)(4), SCRE, sets. See United States v. Siddiqui , 235 F.3d 1318, 1322-23 (11th Cir. 2000) (emails authenticated by circumstantial evidence related to content, including reference to defendant's nickname and facts known only to limited group); see generally Grimm et. al., Authenticating Digital Evidence , 69 Baylor L. Rev. 1 (2017).
We recognize some cases may require more technical methods to authenticate social media. Some courts have held, for example, that tracking a defendant's Facebook page and account to his email address by internet protocol (IP) evidence can satisfy authentication. United States v. Hassan , 742 F.3d 104, 133-34 (4th Cir. 2014) ; see also United States v. Recio , 884 F.3d 230, 236-37 (4th Cir. 2018) (Facebook messages authenticated by a certificate from a Facebook records custodian that record containing the message was made at or near the time it was transmitted, the user name on the account was defendant's, the email address included defendant's name, and over 100 pictures posted to the account depicted defendant, including one wishing the defendant happy birthday). We **234 understand social media could also be authenticated by evidence related to hash values and metadata. See Lorraine v. Markel Am. Ins. Co. , 241 F.R.D. 534, 547-49 (D. Md. 2007). We express no opinion on these methods of proof.
We are aware of the debates over the "Maryland Rule" and the "Texas Rule" concerning social media authentication, see, e.g., State v. Eleck , 130 Conn.App. 632, 23 A.3d 818, 821-25 (2011), but these labels seem to complicate the simple concept embodied in Rule 901, SCRE, and by which writings have long been authenticated. See United States v. Farrad , 895 F.3d 859, 879-80 (6th Cir. 2018) (treating social media evidence like any other documentary evidence for purposes of authentication "fits with common sense: it is not at all clear ... why our rules of evidence would treat electronic photos that police stumble across on Facebook one way and physical photos that police stumble across ... on a sidewalk a different way"); United States v. Browne , 834 F.3d 403, 412 (3rd Cir. 2016) ("We hold today that it is no less proper to consider a wide range of evidence for the authentication of social media records than it is for more traditional documentary evidence."); Parker v. State , 85 A.3d 682 (Del. 2014) (same); Tienda v. State , 358 S.W.3d 633 (Tex. Crim. App. 2012) (same); Com. v. Purdy , 459 Mass. 442, 945 N.E.2d 372 (2011) ; United States v. Barnes , 803 F.3d 209, 217-18 (5th Cir. 2015) (Facebook messages authenticated by witness who saw defendant using Facebook, and recognized his account and writing style).
We do not downplay the fraud risk surrounding social media. The internet flattened the speed of and access to the flow of written information; documents that once sat in dusty file cabinets crammed into office corners now float in the "cloud," making them susceptible to a wider range of mischief. We are persuaded the risk is one Rule 901, SCRE, contemplates and can contain. Lawyers can always argue case-specific facts bearing on this risk and attempt to convince the jury the writing is not genuine.
III.
A. Bailiff Misconduct
We next address whether the trial court abused its discretion in refusing to grant a mistrial due to the bailiff's **235 comments. Our federal and state constitutions guarantee a criminal defendant the right to a trial by an impartial jury. U.S. Const. amend. VI ; S.C. Const. art. I, §§ 3, 14. The right can be infringed when a third party makes improper contact with the jury, for the right is meaningful only if the jury remains free from outside influence, including exposure to evidence or information that has not been introduced during the trial. Turner v. Louisiana , 379 U.S. 466, 471-72, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Wayward bailiffs can improperly influence jurors by exposing them to the very things they are supposed to guard the jury against. See Parker v. Gladden , 385 U.S. 363, 364-65, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (Sixth Amendment violated when jurors overheard bailiff describe defendant as a "wicked fellow" who "was guilty" and if there was anything wrong with a guilty verdict, "the Supreme Court will correct it"). *717 In the event the trial court learns of an allegedly improper contact with a juror, the procedure of Remmer v. United States must be followed:
In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
Remmer v. United States , 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The scope and currency of the Remmer presumption has split the federal circuits, but it "remains [a]live and well in the Fourth Circuit," United States v. Lawson , 677 F.3d 629, 642 (4th Cir. 2012), and therefore controls our approach to the Sixth Amendment issue Green raises. See Barnes v. Joyner , 751 F.3d 229 (4th Cir. 2014) (Section 2254 habeas action; holding North Carolina state post-conviction court contravened clearly established federal law by failing to follow Remmer 's rebuttable presumption approach and requirement that hearing be held on juror **236 misconduct claim). When there is evidence of a substantive communication by a third party with a juror, the Remmer presumption applies, shifting the burden to the State to prove there is no reasonable possibility the improper communication influenced the verdict. Lawson , 677 F.3d at 642.
Mindful the bailiff's "official character ... carries great weight with a jury," Parker , 385 U.S. at 365, 87 S.Ct. 468, we find the comments here triggered Remmer . Green claims the comments irreparably tainted the jury because the bailiff in effect delivered a defective Allen charge outside the courtroom, which coerced the jury into agreeing to a verdict to avoid forced deliberations.
While Remmer requires us to presume the bailiff's blunder prejudiced Green, we conclude the State overthrew the presumption by proving there was no reasonable possibility the comments influenced the verdict. We reach this conclusion for several reasons, paying the deference we owe to the trial court's superior position to gauge credibility in the juror misconduct context. McGill Bros. v. Seaboard Air Line Ry. , 75 S.C. 177, 180, 55 S.E. 216, 217 (1906). First, the trial court found no evidence the comment was communicated to anyone but the foreperson. State v. Kelly , 331 S.C. 132, 141-42, 502 S.E.2d 99, 104 (1998) (holding number of jurors exposed to improper communication relevant to determining whether misconduct influenced jury). Second, there is no evidence the jury was ever deadlocked or even having difficulty reaching a verdict. Third, the bailiff's comments, while astonishingly inappropriate, did not reference facts about the case and cannot be reasonably spun as an Allen charge; the bailiff emphasized the court might give them an Allen charge (there is no evidence the bailiff knew or conveyed what the charge included) in the event of a deadlock, and the court might "see if you can stay later," which suggested an invitation rather than a coercive command. Fourth, none of the jurors testified there was any communication with the bailiff, other than about incidental administrative matters. The trial judge took this to mean not even the foreperson perceived the bailiff's remark as worthy of attention or remembrance. Fifth, all of the jurors testified there was no extraneous influence on their verdict.[3]
**237 This is a far cry from State v. Cameron , which found a bailiff's misleading response to a juror's question about sentencing options compromised the jury's impartiality because it left the impression that their verdict could not affect the trial court's sentencing discretion. 311 S.C. 204, 208, 428 S.E.2d 10, 12 (Ct. App. 1993). And it is different still from the bailiff's corruptive caution to the jury in *718 Blake by Adams v. Spartanburg Gen. Hosp. , that the trial judge "did not like a hung jury, and that a hung jury places an extra burden on taxpayers." 307 S.C. 14, 16, 413 S.E.2d 816, 817 (1992). See also Ward v. Hall , 592 F.3d 1144, 1175-82 (11th Cir. 2010) (right to impartial jury violated by bailiff's comments to sentencing jury that life without parole sentence was not an option in death penalty case).
We commend the trial court's deft handling of this issue. Because the evidence excludes any reasonable possibility that the bailiff's misconduct influenced the jury's impartiality or its verdict, the trial court did not abuse its discretion in denying Green's mistrial motion. Kelly , 331 S.C. at 141-42, 502 S.E.2d at 104.
Accordingly, Green's convictions are
AFFIRMED.[4]
WILLIAMS and GEATHERS, JJ., concur.

Allen v. United States , 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Although the "e" in "email" is an abbreviation for "electronic," seasoned lawyers (and many surprised litigants) would agree with the interpretation attributed to former San Francisco Mayor Willie L. Brown that the "e" in "email" stands for "evidence."

Not before us is the issue of how far a trial court can go in questioning jurors post-verdict without crossing the bounds of Rule 606(b), SCRE. Some courts have ruled such questioning may only explore the existence and nature of the outside contact, and may not delve into its effect on the jury. See, e.g., Haugh v. Jones & Laughlin Steel Corp ., 949 F.2d 914, 918 (7th Cir. 1991) ; Stockton v. Virginia , 852 F.2d 740, 744 (4th Cir. 1988) ; Cf. Pena-Rodriguez v. Colorado , --- U.S. ----, 137 S. Ct. 855, 869, 197 L.Ed.2d 107 (2017) (discussing Fed. R. Evid. 606 and history of rule against impeachment of verdicts and creating exception where juror expresses racial bias against criminal defendant).

We decide this case without oral argument pursuant to Rule 215, SCACR.