Filed 2/11/21  P. v. West CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B303435 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA479062) |
| v. | |
| MARCUS WEST, | |
| Defendant and Appellant. | |

APPEAL from a post-judgment order of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed.

Kelly A. Woodruff, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Lindsay Boyd, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant Marcus West (defendant) of criminally threatening his wife, M.W., via a Facebook message and of violating a criminal protective order that prohibited such communication.  The only documentary evidence at trial of the threatening message was a screenshot printout of the offending message.  We are asked to decide whether the printout was sufficiently authenticated to permit its introduction into evidence, whether defendant's convictions are supported by substantial evidence, and whether the trial court erred by not instructing the jury on the lesser included offense of attempted criminal threats.

## I.  BACKGROUND

*A.    The Message*

Defendant and M.W.'s ten-year marriage was often turbulent.  In February 2019, defendant was convicted of a domestic violence offense, placed on probation, and served with a protective order barring him from having any personal or electronic contact with M.W.  Defendant and M.W. continued to have contact, however, despite the protective order.

One morning in June 2019, M.W. was angry at defendant (the record does not disclose why) and she disconnected service to his mobile phone by removing it from her telephone service provider account.  When she woke up from a nap later that day, she saw a Facebook message on her phone, sent at 6:30 a.m., that read:  "Bitch, keep playing games[.]  Ho[ ], you're my wife and always will be.  Bitch, I will kill you if you don't leave Bryan

alone.[1]  [Y]ou better [remove] that restraining order also.  You belong to me.  I will make your life miserable.  [L]et me catch you with someone else[,] I'm going to hurt both of you.  I'm not going to allow [yo]u to play me like this, bitch.  You have no choice but to stay with me.  Fuck the cops and the judges[.]  I'll beat this case again and really make sure [you're] dear.[2]  If I can't have you[,] nobody can, bitch[.]  Remember that."

Less than two hours after seeing the message, M.W. sought help at a Los Angeles Police Department (LAPD) station.  The desk officer who met with M.W. described her as "visibly upset" and "crying and shaking."  M.W. showed the Facebook message to the desk officer on her phone.  She then took a screenshot of the message, which displayed as having been sent from Marcus West (i.e., defendant's name), and emailed the screenshot to the officer, who printed out the emailed image and attached it to his written report.  M.W. told the desk officer that the message was from defendant.

After this initial visit, M.W. returned to the police station on at least two subsequent occasions to see what progress had been made in their investigation.  Ten days after M.W. received the message, two LAPD officers interviewed M.W. at her home.  According to both officers, M.W. appeared "very scared," "very worried, and "frightened."

---

[1]     M.W. was in a "phone relationship" with an incarcerated man named Bryan, and M.W. believed Bryan was in communication with defendant via Facebook.

[2]     At trial, M.W. testified she read "dear" as a typo and understood the message to say "make sure you're dead."

During the interview, M.W. opened a Facebook app on her phone and showed the threatening message to the lead investigating officer. He visually confirmed the screenshot printout that M.W. emailed the police matched the message as displayed by the Facebook app on M.W.'s phone. The lead investigator also saw a picture to the left of the message, and he recognized the person in the picture as defendant. (The police also noted M.W. and the Facebook account for Marcus West had 62 Facebook "friends" in common.)

The next day, the lead investigator telephoned M.W., who still sounded "near hysterical" with fear. During the call, M.W. confirmed the photograph associated with the Facebook message was a photograph of defendant. The lead investigator then placed a preservation hold on defendant's Facebook account and obtained a search warrant for records relating to that account. The warrant did not meet the company's criteria for the release of information, however, and Facebook did not produce any of the records the warrant requested.

The police later located defendant and arrested him. Once he was in custody, M.W. changed her story about the message and the threat posed to her by defendant. When she first met with the district attorney, she told him her own mother sent the threatening message. According to M.W., her mother was a competent computer hacker who used her skills to send the message from defendant's Facebook account in order to frame defendant because she did not approve of his relationship with M.W. A few weeks before trial, and at defendant's urging, M.W. met with the district attorney a second time and gave him a letter asking to rescind the protective order because she and defendant had made progress in their relationship.

4

*B.     Trial*

At trial, before opening statements, defendant moved to exclude the screenshot printout from evidence.  Defendant argued the prosecution could not authenticate it because the photograph next to the message was blurry on the printout, because the printout did not show the date of the message, and because the police had otherwise failed to establish the printout's authenticity.  The prosecutor argued the printout was admissible because the message itself included specific, personal information known to both M.W. and defendant (e.g., the existence of the protective order and the reference to Bryan), which was sufficient for a prima facie showing of authenticity.  In the prosecution's view, questions about whether defendant was at all times in sole control of his Facebook account went to the weight of the evidence, not its admissibility.

The trial court overruled the defense objection.  The court found the prosecution could meet its prima facie burden through testimony of M.W. and the police.  The court further reasoned the defense counterarguments went to the weight, not the admissibility "foundation-wise," of the screenshot printout.

With the presentation of evidence underway, M.W. testified she would sometimes enter into relationships with other men during periods of separation from defendant during their marriage, which would make him unhappy and sometimes violent.  Four months before she received the threatening message, M.W. obtained a criminal protective order after defendant pushed her down, punched her in the stomach, and hit her in the face multiple times.  But defendant and M.W. remained in contact almost every day despite the order, and sometimes they spent the night together.

With regard to the threatening message, M.W. testified the printout of the screenshot displayed the message she received. She acknowledged the message was sent from defendant's Facebook account and, at the time, she believed—but was not completely certain—it had been authored by defendant. M.W. also admitted she made up her theory about her mother hacking defendant's Facebook account in order to shift blame for the message away from defendant.

As to how the message made her feel, M.W. said that when she first read the message it frightened her "a little bit." Under further questioning, she admitted she went to the police station and returned to check on the status of their investigation because she was "actually" scared and "in fear of her life."[3] At another point in her testimony, however, M.W. denied being upset or crying when she first reported the message to the police. She also denied telling the lead investigator, during the interview ten days after receiving the threatening message, that she was still in fear; she maintained she told him only that she was "worried" and "concerned." M.W. also admitted that during the ten-day interval between receiving the message and being interviewed at her home, she allowed defendant to stay overnight in her home "once or twice" because defendant was having problems with his housing.

The defense's only witness, a social media expert, testified that when she viewed defendant's publicly accessible profile page on Facebook she found no photos—only his name. On cross-

---

[3]     M.W. testified her state of fear was heightened by reports from her building's security personnel that defendant was riding his bicycle repeatedly past the building.

examination, defendant's expert conceded that hacking into a Facebook account would be difficult even for someone who had been given the user's password, especially if the hacker was using a device different from the one the account owner regularly used to access his or her account.

The jury convicted defendant of making a criminal threat against M.W. (Pen. Code,[4] § 422, subd. (a)) and contempt of court for violating the protective order (§ 166, subd. (c)(1)). The trial court sentenced defendant to a total of three years in prison: three years for the criminal threat conviction and 364 days, to be served concurrently, for the contempt of court conviction.

## II. DISCUSSION

Defendant's principal argument for reversal, i.e., the screenshot of the Facebook message was inadmissible because there was "no evidence" to show it was sent by defendant, is meritless. The trial court was charged with determining only whether the prosecution made a prima facie showing of authenticity, which it did. M.W. showed the message on her phone to two different police officers, and one of those officers witnessed M.W. take the screenshot of the message. The printout of the screenshot included defendant's name, his photograph, and a message with details that would be known to few people (if any) beyond defendant. And the message was sent at a time when defendant would have a motive to make such a threat, both because of his wife's relationship with the other man "Bryan" and because she had disconnected his phone service. This

---

[4]     Undesignated statutory references that follow are to the Penal Code.

7

circumstantial evidence and related testimony was sufficient for the prosecution to meet its threshold burden of admissibility, and indeed, solid evidence that supports the jury's finding that defendant sent the message.

We additionally conclude there is substantial evidence defendant's Facebook message caused M.W. to suffer sustained fear, one of the elements of a criminal threats offense. We further hold the absence of an instruction on the lesser included offense of attempted criminal threats does not warrant reversal. Even viewing the evidence in the light most favorable to defendant, there is no substantial evidence M.W. did not suffer sustained fear, and regardless, there certainly is no reasonable probability the jury would have convicted on the lesser, not the greater, offense if it had been so instructed.

### A. The Screenshot Printout Was Sufficiently Authenticated

Authentication is statutorily defined as "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is." (Evid. Code, § 1400.) As our Supreme Court has observed, authentication is essentially a "subset of relevance." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266-267 (*Goldsmith*).) Accordingly, the "first step is to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case." (*Id*. at 267.)

Only a prima facie showing is required because "[t]he ultimate determination of the authenticity of the evidence is for the trier of fact, who must consider any rebuttal evidence and balance it against the authenticating evidence in order to arrive at a final determination on whether the [writing], in fact, is authentic." (*In re K.B.* (2015) 238 Cal.App.4th 989, 997 (*K.B.*); Cal. Law Revision Com. com., 29B pt. 5, West's Ann. Evid. Code (2015 ed.) foll. § 1400, p. 193 ["the fact that the judge permits the writing to be admitted in evidence does not necessarily establish the authenticity of the writing; all that the judge has determined is that there has been a sufficient showing of the authenticity of the writing to permit the trier of fact to find that it is authentic"].)  As our Supreme Court has explained:  "'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Goldsmith, supra*, 59 Cal.4th at 267; accord, *People v. Landry* (2016) 2 Cal.5th 52, 87 (*Landry*).)

A proponent of an evidentiary exhibit may authenticate evidence through testimony of the person who created the exhibit or "by other witness testimony, circumstantial evidence, content and location." (*Goldsmith, supra*, 59 Cal.4th at 268.)  For example, "[a] writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing." (Evid. Code, § 1421.)

*People v. Cruz* (2020) 46 Cal.App.5th 715 (*Cruz*), another case involving criminal threats made via social media, is illustrative.  In *Cruz*, the court considered whether the

9

prosecution made a sufficient prima facie showing that Facebook messages to the victim "from 'Emilio Lopez' and 'Henry Hall' were what the prosecution claimed they were—Facebook messages sent to [the victim] by defendant," albeit using fictitious names. (*Id.* at 730.) The Court of Appeal concluded that even though the prosecution had not subpoenaed confirming records from Facebook (*id.* at 728), and even though the messages had no dates or times and could have been sent by persons other than defendant (*ibid.*), the trial court did not abuse its discretion in admitting the messages in evidence in light of the content of the messages and the testimony of the victim and two others who received text messages from the defendant that contained similar threating language. (*Id.* at 720, 728, 730.) The *Cruz* court explained: "[T]he Facebook messages to [the victim] from 'Henry Hall' and 'Emilio Lopez' included content that defendant communicated to [the victim] and others by means other than the Facebook messages themselves . . . . In addition, the messages included things defendant knew about or had access to, independently of the messages themselves . . . . This circumstantial evidence . . . made a prima facie showing that the Facebook messages to [the victim] were sent by defendant." (*Id.* at 731; see also *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435-1436 [printouts from defendant's MySpace page were authenticated because "the page was password protected for posting and deleting content," "the MySpace page icon identifying the owner of the page displayed a photograph of Valdez's face," and the page identified the owner's interests, which "matched what the police otherwise knew of Valdez's interests from their field contacts with him"]; *United States v. Browne* (3d Cir. 2016) 834 F.3d 403, 413-414 [Facebook chat logs properly authenticated

10

because, among other things, personal information that the defendant confirmed on the witness stand was consistent with the personal details that "Billy Button" interspersed throughout his Facebook conversations with the victims]; *State v. Green* (S.C. 2019) 830 S.E.2d 711, 715-716 [personal information (names, addresses, and relationships) found in the content of Facebook messages was sufficient to authenticate them].)

The trial court here did not abuse its discretion in admitting the screenshot printout in evidence. (*Goldsmith*, *supra*, 59 Cal.4th at 266 [abuse of discretion standard applies to claims of evidentiary error].) The printout was an accurate copy of the screenshot (as witness testimony established) and the screenshot itself—essentially a photograph of the message—was taken by M.W. and witnessed by the desk officer.[5] It is well recognized that a photograph may by authenticated by the person who took it or witnessed it being taken. (*People v. Beckley* (2010) 185 Cal.App.4th 509, 514-516 ["'the testimony of a person who was present at the time a film was made that it accurately depicts what it purports to show is a legal foundation for its admission into evidence'"].) The printout showed that the message came from a Facebook user with the same name as defendant and who was one of M.W.'s Facebook friends. The

---

[5] Insofar as defendant argues the printout of the screenshot should not have been admitted under the Secondary Evidence Rule (Evid. Code, § 1520), that was not the basis of the objection at trial and the argument is forfeited. (See, e.g., *Landry, supra*, 2 Cal.5th at 86 [holding defendant forfeited Secondary Evidence Rule challenge by not raising it in the trial court].) It is also wrong on the merits—there was no dispute the printout was an accurate copy of the message and there was no testimony the prosecution ever had the "original" message in its possession.

11

printout also displayed a photograph of the sender, which M.W. affirmed was a photograph of defendant, and the lead investigator testified he also recognized defendant as the person depicted in the photograph when he viewed the message on M.W.'s phone. M.W. testified to reasons why defendant would have been angry with her at the time she received the threatening message, which further tends to corroborate the conclusion that defendant sent the message. Social media experts for both the prosecution and the defense testified Facebook accounts are password protected and M.W. disavowed the only person proffered as someone who might have hacked defendant's account (her mother). Most critically, the content of the message contained facts known to defendant and likely few if any others: the message identified M.W. as defendant's wife, referenced the protective order, and named the individual with whom M.W. was carrying on a telephone relationship at the time. Taken together, this circumstantial evidence provided the requisite "prima facie case" of authenticity. Arguments about the thoroughness of the police investigation into the message and the possibility that the message was authored by someone other than defendant who accessed his Facebook account went to the weight of the evidence, not its admissibility.

B.    *Substantial Evidence Supports the Defendant's Convictions*

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the

12

statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*); accord, *People v. Orloff* (2016) 2 Cal.App.5th 947, 953.) Defendant challenges the sufficiency of the evidence regarding the first and fourth of these elements, i.e., whether defendant sent the threatening message and whether M.W. suffered sustained fear as a result.

We consider defendant's challenge using the substantial evidence standard of review. We review the record "'in the light most favorable to the judgment below to determine whether it discloses . . . evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

### 1. Identity

For all the reasons we have already given, there was reasonable, credible, and solid evidence at trial that defendant was the author of the threatening Facebook message. The printout of the screenshot indicated the message was from a

13

Facebook user with the same name as defendant and who was a Facebook friend of M.W.; the printout displayed a photograph of the defendant; the message, which was sent only to M.W., contained personal information about M.W. known to the defendant; upon receiving the message, M.W. immediately recognized the sender as defendant; M.W. told the desk officer unequivocally that the message had been sent by defendant; in the past, defendant had reacted violently when confronted with evidence that M.W. had entered into a relationship with another man; and M.W. admitted she had no facts to support her post-arrest theory that her mother hacked defendant's Facebook account and sent the message.

### 2. *Sustained Fear*

Sustained fear for purposes of section 422 means a period of time that extends beyond what is "momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) A victim's fear need not last for an extended period, such as days or weeks. Several courts, for example, have found "[f]ifteen minutes of fear . . . is more than sufficient to constitute 'sustained' fear for purposes of . . . section 422." (*Id.* at 1153, 1156 [15 minutes between threat and defendant's arrest sufficient for finding of sustained fear]; accord, *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1346, 1348-1349 (*Fierro*) [affirming a finding of sustained fear where the defendant threatened to kill the victim during an incident at a gas station, and the victim was still in fear 15 minutes after he had left the station and was driving on the freeway]; *People v. Wilson* (2015) 234 Cal.App.4th 193, 197 (*Wilson*) [affirming a criminal threat conviction where the defendant "acted 'crazy' and unreasonably" in the victim's

14

yard for 15 to 20 minutes and threatened to kill the victim and his family].) In considering whether the statutory element of sustained fear was met, a trier of fact may rely on evidence indicating the victim had knowledge of the defendant's prior threatening conduct and had previously reported this conduct to the police. (*Allen, supra*, 33 Cal.App.4th at 1156.)

There is strong evidence M.W. was in sustained fear after reading defendant's threatening message. M.W., who had prior knowledge of defendant's violence and had previously sought police protection from that violence, read the message and shortly thereafter sought help from law enforcement. The desk officer testified M.W. was visibly upset and crying when he took her complaint. (Although M.W. denied being upset or crying during her interview with the desk officer when testifying at trial, she never testified she was not scared at that time.) There was also testimony from the lead investigator and his partner that M.W.'s demeanor remained fearful even days later. Moreover, even while testifying and attempting to minimize the fear she felt, M.W. still conceded she told the lead investigator some ten days after first reading the Facebook message that she was "worried" and "concerned." That is just fear by another name. The evidence on the sustained fear element of a criminal threats offense was amply sufficient.[6]

---

[6] Because there was substantial evidence to support the criminal threat conviction, we also hold that there was substantial evidence to support the contempt of court conviction.

15

## C. The Absence of a Lesser Included Offense Instruction Does Not Warrant Reversal

"[E]very lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 155 (*Breverman*).) This is true even absent a request for such an instruction. (*People v. Birks* (1998) 19 Cal.4th 108, 112.) However, "the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense." (*Breverman*, *supra*, 19 Cal.4th at 162.) Rather, "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. . . . 'Substantial evidence' in this context is evidence from which a jury composed of reasonable [persons] could . . . conclude [ ] that the lesser offense, but not the greater, was committed." (*Ibid*.)

Defendant argues the trial court should have sua sponte instructed the jury on attempted criminal threats as a lesser included offense. (*Toledo*, *supra*, 26 Cal.4th at 231 [holding the language of the sections 422 and 664 support the existence of the crime of attempted criminal threats].) Such an instruction is required when there is substantial evidence "a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear . . . ." (*Toledo*, *supra*, 26 Cal.4th at 231.) We review the trial court's failure to instruct on a lesser included offense de novo (*People v. Nelson* (2016) 1

16

Cal.5th 513, 539), considering the evidence in the light most favorable to the *defendant*. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; *People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1028.)

There was no substantial evidence of a lack of sustained fear here. At most, M.W. denied expressing fear to the investigating officers 10 days after receiving the message—she said she was only worried and concerned. As we have already said, expressing her emotion in terms of worry rather than in terms of fear strikes us as a matter of meaningless semantics. Regardless, M.W. never denied experiencing fear (described using that specific word) in the earlier days after reading defendant's threats and there was abundant evidence (her words and actions during that time) that she was indeed fearful.[7] That undisputed initial fear, which really need only last for minutes not days as here (*Allen*, *supra*, 33 Cal.App.4th at 1156), defeats any suggestion that a lesser included offense instruction was required. Moreover, even if such an instruction were required, it was harmless not to give it on these facts. (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Breverman*, *supra*, 19 Cal.4th at 165, 177 [when assessing prejudice we "focus[ ] not on what a reasonable jury could do, but what such a jury is likely to have done" and we "consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so

---

[7] That M.W. later took action arguably inconsistent with her earlier fear (allowing defendant to shelter in her apartment) does not negate her initial fear.

17

comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result"].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.