# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent

v.

Zantravious Randell Hall, Appellant.

Appellate Case No. 2018-002176

---

Appeal From Greenwood County
Donald B. Hocker, Circuit Court Judge

---

Opinion No. 5919
Heard December 8, 2021 – Filed June 22, 2022

---

**AFFIRMED**

---

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Senior Assistant Attorney General W. Edgar Salter, III,
all of Columbia, and Solicitor David Matthew Stumbo, of
Greenwood, all for Respondent.

---

**KONDUROS, J.:** Zantravious Randell Hall appeals his convictions for murder, attempted murder, and possession of a weapon during the commission of a violent crime. Hall contends the trial court erred by (1) failing to admit certain social

media messages into evidence and (2) enhancing his sentence to life imprisonment without the possibility of parole (LWOP) pursuant to section 17-25-45 of the South Carolina Code (2014 & Supp. 2021) (the recidivist statute). We affirm.

## FACTS

On November 21, 2017, Michael "Luke" Lukie and Timothy Wilson were smoking marijuana across the street from Phoenix Place Apartments. Emyle "Gump" McDuffie exited his apartment, joined Lukie and Wilson, and asked Lukie if he could borrow a pair of pants. Lukie said he had a pair for McDuffie at his apartment, so he and McDuffie began walking that way without Wilson.

According to Lukie, someone in a red car pulled up to them as they were walking and called out to McDuffie. When McDuffie reached the car, Lukie saw Hall get out, ask McDuffie a question, and then start shooting a gun. Lukie got shot in his hip, but he managed to run away and get into another car with McDuffie's sister and her girlfriend, who then drove him to the hospital.

Wilson claimed he did not "see the actual shooting" but saw a red car "pull[] in and let loose." Wilson also saw McDuffie fall to the ground and watched Lukie run away. Phoenix Place Apartment residents Marisha C.,[1] Lakisha Bletcher, and Terrance Gilchrist all heard gunshots and rushed to the scene of the shooting, where they found McDuffie shot and lying on the ground. Bletcher and Gilchrist picked McDuffie up and put him in Gilchrist's car, and Gilchrist drove him to the hospital. Hospital personnel attempted to resuscitate McDuffie, but he was pronounced dead.

At the hospital, Lukie told officers to look for a red car with tinted windows on security cameras at a 7-Eleven convenience store located about twenty-five yards from Phoenix Place Apartments; however, Lukie did not initially tell officers that Hall was the shooter. After interviewing other witnesses[2] and reviewing the

---

[1] The record does not contain Marisha's surname because she was a minor when she testified.

[2] Marisha told officers she saw McDuffie talking through the passenger window of a red car with tinted windows immediately before she heard gunshots. Bletcher told officers she saw a red car with tinted windows leave the apartment complex shortly after the shooting occurred.

7-Eleven surveillance video, officers issued a "be on the look out" alert for a red car with tinted windows.  A few hours later, officers saw a car matching that description about two miles from the scene of the shooting and attempted a traffic stop; however, Hall led officers on a chase through rush-hour traffic.  Eventually, Hall crashed the red car and fled on foot, but officers apprehended him.

Officers determined the car belonged to Hall's pregnant girlfriend, Miangel Clark, towed it from the crash site, and searched it pursuant to a warrant the next day.  Officers recovered a 9 mm shell casing from the cowl of the car,[3] and a red bandana, Hall's driver's license, and Hall's birth certificate from inside the car.  Tests for fingerprints and DNA inside the car were negative or inconclusive, but the bandana tested positive for gunshot residue.  At the scene of the shooting, officers recovered thirteen shell casings and removed a bullet from an apartment wall.  Additionally, officers obtained bullet fragments from Lukie's hip, and McDuffie's thigh, lower leg, right foot, and clothing.

The State charged Hall with murder, attempted murder, possession of a weapon during the commission of a violent crime, and failure to stop for a blue light.  The State also served notice on Hall that it was seeking LWOP for the murder and attempted murder charges pursuant to the recidivist statute.  At trial, Lukie testified Hall got out of Clark's car and started shooting.  Lukie explained he initially did not tell officers Hall was the shooter because he wanted to first tell McDuffie's family and he did not want to be labeled a snitch.  Marisha testified she saw McDuffie walk towards Clark's car and talk to someone through the passenger side window shortly before she heard gunshots.  Bletcher testified she saw Clark's car leave the apartment complex shortly after the shooting.

Officers never located the gun used at the Phoenix Place Apartments shooting, but a forensic firearms examiner for the South Carolina State Law Enforcement Division (SLED), James Green, determined a 9 mm gun had fired all but one of the recovered bullet fragments.  Green testified the unidentified bullet fragment was too damaged to determine if it had been fired by a 9 mm gun, and all of the bullet fragments were too damaged to determine if they had been fired by the same 9 mm gun.  Still, Green opined the same 9 mm gun had fired all fourteen 9 mm shell casings officers recovered.  Additionally, the forensic pathologist who performed

_____

[3] The cowl is immediately below the windshield wipers and separates the windshield from the hood.

McDuffie's autopsy testified he had been shot nine times and opined the gunshot wound to his back was clearly the fatal shot.

The State also introduced recordings of three telephone conversations Hall initiated while detained in the Greenwood County Detention Center. During a November 23, 2017 conversation, the recipient of Hall's call said there was a rumor that Hall was mad at McDuffie because McDuffie and Clark had been having sex and McDuffie was probably the father of Clark's unborn child. Hall denied the rumor and said McDuffie and Clark could not have been having sex because Hall had been sleeping with Clark every night for three months. Hall said he had Clark's car "24/7" and explained he drove Clark to and from work every day. Hall claimed no one had seen Clark drive her car since he began "talking to her." During a November 30, 2017 conversation, the recipient of Hall's call claimed officers had found fingerprints in Clark's car. Hall asked "who's fingerprints," said he had "wiped that mother fucker down," and laughed. Finally, during a December 4, 2017 conversation, Hall's mother told him to "talk in code" before they talked about cleaning and disposing of his shoes.

The State also charged Cedric Elmore and Kemad White for murder and attempted murder based at least in part on Joseph Holland's statement to officers that he saw Elmore and White shoot McDuffie after they got out of a red car driven by Hall. However, Hall was tried alone. During Hall's case-in-chief, Holland claimed he had told officers what he had heard from others rather than what he had seen. Holland testified he saw gunshots coming from a red car but could not see the shooter.

Additionally, Hall sought to introduce evidence from Snapchat[4] and present Elmore's girlfriend, Raven Jackson, as a witness. According to Hall's attorney,

---

[4] Snapchat is a popular social media platform for cell phones that allows users to send modifiable photographs, videos, and text messages that are only visible for a limited time after the recipient opens them. *Explainer: What is Snapchat?*, Webwise, https://www.webwise.ie/parents/explainer-what-is-snapchat-2/ (last visited June 15, 2022). Users can send messages directly to another user with a timer of 1-10 seconds; alternatively, users can send messages without a timer, and the messages disappear after the recipient's initial viewing. *Id.* Additionally, users can post messages to their "story," which allows their friends to view them multiple times for twenty-four hours. *Id.* However, message senders can save

Jackson was prepared to testify Elmore sent her video messages via Snapchat that placed him at their apartment when the Phoenix Place Apartments shooting occurred.[5]  However, the trial court prohibited the Snapchat evidence due to concern the material's date and time stamp had been manipulated in some way. Hall maintained Jackson could authenticate the evidence and submitted court exhibits but declined to proffer her testimony.

Ultimately, the jury found Hall guilty of murder, attempted murder, and possession of a weapon during the commission of a violent crime.[6]  The trial court deferred sentencing to consider Hall's memorandum in opposition to sentencing pursuant to the recidivist statute.  When Hall was fifteen years old, the State charged him with assault and battery with intent to kill (ABWIK).  The family court transferred Hall's case to general sessions court, and he pled guilty on December 7, 2011.

The State argued Hall's murder and attempted murder sentences should be enhanced to LWOP pursuant to the recidivist statute because they were considered most serious offenses, and Hall's ABWIK conviction was also a most serious offense.  Hall argued his ABWIK conviction should not enhance his sentences under the recidivist statute because he was a juvenile when he committed that offense and the family court failed to make adequate findings of fact pursuant to *In*

---

messages before sending them, and message recipients can save messages by taking a screenshot of their phone or using their screen recorder before the message disappears. *How To Screenshot On Snapchat Without The Sender Knowing (2022)*, Alphr, https://www.alphr.com/social-media/1007983/how-to-screenshot-on-snapchat-without-them-knowing/#:~:text=Swipe%2C%20locate%2C%20and%20select%20the,screenshot%20alert%20will%20not%20appear (last visited June 15, 2022).

[5] Hall was attempting to use the Snapchat messages and Jackson's testimony to further discredit Holland's initial statement that he saw Elmore and White shoot McDuffie after they got out of a red car driven by Hall.

[6] During the State's case-in-chief, Hall pled guilty to failure to stop for a blue light.

*re Sullivan*[7] before it transferred that case to general sessions court.[8] Alternatively, Hall asserted his mandatory LWOP sentence enhancements due to his ABWIK conviction violated the Eight Amendment's prohibition on cruel and unusual punishment because he was a juvenile when he committed that offense. The trial court denied Hall's motion and sentenced him to LWOP for both murder and attempted murder pursuant to the recidivist statute.[9] The trial court did not impose a sentence for Hall's possession of a weapon during the commission of a violent crime conviction pursuant to section 16-23-490(A) of the South Carolina Code (2015). This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The conduct of a criminal trial is left largely to the sound discretion of the trial judge, who will not be reversed in the absence of a prejudicial abuse of discretion." *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007). "An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law." *Id.*

## LAW/ANALYSIS

### I. Excluded Evidence

---

[7] 274 S.C. 544, 548, 265 S.E.2d 527, 529 (1980) ("[I]t is the responsibility of the family court to include in its waiver of jurisdiction order a sufficient statement of reasons for, and considerations leading to, that decision. Conclusory statements, or a mere recitation of statutory requirements, without further explanation will not suffice. The order should be sufficient to demonstrate that the statutory requirement of full investigation has been met and that the question has received full and careful consideration by the family court. The salient facts upon which the order is based are to be set forth in the order.").

[8] On October 11, 2018, while his trial for the Phoenix Place Apartments shooting was underway, Hall filed an application for post-conviction relief (PCR) challenging the ABWIK conviction for the first time. On December 14, 2021, the State filed a Return. As of the date of this writing, that action is still pending.

[9] The trial court gave Hall a time-served sentence for failure to stop for a blue light.

Hall asserts the trial court erred by failing to admit the Snapchat messages between Elmore and Jackson into evidence. Hall contends the messages were relevant because they were evidence of an alibi for Elmore, which discredited Holland's initial statement that placed Hall and Elmore together at the scene of the shooting. Hall maintains the messages could have been properly authenticated pursuant to Rule 901, SCRE, because (1) Jackson received the messages and would have testified about her personal knowledge regarding them and (2) circumstantial evidence of the messages' distinctive characteristics established the evidence was what it purported to be. We agree the trial court erred, but we find that error harmless.

"[E]vidence must be authenticated or identified in order to be admissible." *State v. Brown*, 424 S.C. 479, 488, 818 S.E.2d 735, 740 (2018). "The authentication standard is not high, and a party need not rule out any possibility the evidence is not authentic." *State v. Green*, 427 S.C. 223, 230, 830 S.E.2d 711, 714 (Ct. App. 2019) (citation omitted), *aff'd as modified*, 432 S.C. 97, 851 S.E.2d 440 (2020). "The trial judge acts as the authentication gatekeeper, and a party may open the gate by laying a foundation from which a reasonable juror could find the evidence is what the party claims." *Id.* "The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court[,] and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." *State v. Cartwright*, 425 S.C. 81, 89, 819 S.E.2d 756, 760 (2018) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847-48 (2006)).

"Social media messages and content are writings, and evidence law has always viewed the authorship of writings with a skeptical eye." *Green*, 427 S.C. at 230, 830 S.E.2d at 714. "The requirement of authentication cannot be met by merely offering the writing on its own. Something more must be set forth connecting the writing to the person the proponent claims the author to be." *Id.* at 231, 830 S.E.2d at 714 (citation omitted). "Rule 901(b), SCRE, lists ten non-exclusive methods of authentication." *Id.* at 231, 830 S.E.2d at 715. "Rule 901, SCRE, does not care what form the writing takes, . . . . [a]ll that matters is whether it can be authenticated, for the rule was put in place to deter fraud." *Id.* at 231, 830 S.E.2d at 714.

Under Rule 901(b)(1), SCRE, evidence may be authenticated by "having someone with personal knowledge about the writing testify the matter is what it is claimed

to be." *Id.* at 231, 830 S.E.2d at 715. "This method may be accomplished by testimony from a person who sent or received the writing." *Id.* Additionally, "[o]ne who witnessed the creation or signing of the writing also has the personal knowledge Rule 901(b)(1), SCRE, demands." *Id.* "As long as a witness with personal knowledge testifies that an exhibit accurately portrays what it depicts, that should be sufficient to establish its authenticity." 3 Barbara E. Bergman et al., *Wharton's Criminal Evidence* § 14:2 (15th ed. 2021).

Alternatively, "[m]ost writings meet the authenticity test through Rule 901(b)(4), SCRE, which enables authentication to be proven by: '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *Green*, 427 S.C. at 232, 830 S.E.2d at 715 (second alteration in original) (quoting Rule 901(b)(4), SCRE). "Rule 901(b)(4), SCRE, meshes with prior South Carolina law, which has long endorsed authentication by circumstantial proof." *Id.*

Additionally, "appellate courts will not set aside convictions due to insubstantial errors not affecting the result." *State v. Brown*, 424 S.C. 479, 493, 818 S.E.2d 735, 743 (2018) (quoting *State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006)). "Where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached,' an insubstantial error that does not affect the result of the trial is considered harmless." *Id.* (quoting *State v. Byers*, 392 S.C. 438, 447, 710 S.E.2d 55, 60 (2011)). "A harmless error analysis is contextual and specific to the circumstances of the case." *Id.* (quoting *Byers,* 392 S.C. at 447-48, 710 S.E.2d at 60). "Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed." *Id.* (quoting *State v. Price*, 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006)). "'Harmless beyond a reasonable doubt' means the reviewing court can conclude the error did not contribute to the verdict beyond a reasonable doubt." *State v. Mizzell*, 349 S.C. 326, 334, 563 S.E.2d 315, 319 (2002).

In *Green*, the defendant asserted the trial court erred by admitting into evidence Facebook messages allegedly between his codefendant and the victim because they were not properly authenticated. 427 S.C. at 227, 229, 830 S.E.2d at 712, 714. First, this court noted social media's seemingly unique authentication problems "dissolve against the framework of Rule 901, SCRE." *Id.* at 230, 830 S.E.2d at 714. Applying that framework, this court determined the messages could not be authenticated by personal knowledge under Rule 901(b)(1), SCRE, because the

testifying witness did not send or receive the messages, nor witness their creation. *Id.* at 231, 830 S.E.2d at 715.

However, this court then applied Rule 901(b)(4), SCRE, and determined the messages had been authenticated because their content "was distinctive enough that a reasonable jury could find [his codefendant] wrote them." *Id.* at 233, 830 S.E.2d at 715. This court noted several facts linked the messages to the defendant via his codefendant and ruled that "[t]aken together, th[o]se circumstances serve[d] as sufficient authentication to meet the low bar Rule 901(b)(4), SCRE, sets." *Id.* at 233, 830 S.E.2d at 715-16. This court concluded it was "persuaded the [fraud] risk [surrounding social media] is one Rule 901, SCRE, contemplates and can contain. Lawyers can always argue case-specific facts bearing on this risk and attempt to convince the jury the writing is not genuine." *Id.* at 234, 830 S.E.2d at 716.

Here, the trial court erred by failing to admit the Snapchat video messages between Elmore and Jackson into evidence. Unlike the witness in *Green*, Jackson received the messages from Elmore; therefore, she could have authenticated the messages with personal knowledge under Rule 901(b)(1), SCRE.[10] While there is a risk the video messages were not contemporaneously recorded at the time they were sent, a reasonable jury could find the messages were what Jackson said they were: videos of Elmore playing with their daughter at their home while the Phoenix Place Apartments shooting occurred. Indeed, "[t]he authentication standard is not high, and a party need not rule out any possibility the evidence is not authentic." *Green*, 427 S.C. at 230, 830 S.E.2d at 714 (citation omitted). "Lawyers can always argue case-specific facts . . . and attempt to convince the jury the writing is not genuine." *Id.* at 234, 830 S.E.2d at 716.

However, the trial court's error was harmless. First, the Snapchat messages between Elmore and Jackson had little probative value. While the excluded evidence would have contradicted Holland's initial statement that he saw Hall,

---

[10] Because we determine the messages could have been authenticated by Jackson's personal knowledge under Rule 901(b)(1), SCRE, we do not address Hall's contention that the messages could have been authenticated by circumstantial evidence under Rule 901(b)(4), SCRE. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting appellate courts do not need to address remaining issues when the determination of a prior issue is dispositive).

Elmore, and White involved in McDuffie's shooting, Holland recanted that statement and testified at Hall's trial that he could not see those involved. More importantly, the excluded evidence provided an alibi for Elmore, not Hall.

Additionally, the record contained substantial evidence of Hall's guilt. Multiple witnesses testified the shooter was in a red car with tinted windows, and Lukie, Marisha, and Bletcher identified Clark's car as the red car they saw involved in the shooting. Moreover, Hall was in Clark's car a few hours after the shooting, and Hall did not stop when officers attempted to pull him over. Also, the State presented the following evidence that officers recovered from Clark's car: (1) a red bandana that tested positive for gunshot residue; (2) Hall's driver's license; (3) Hall's birth certificate; and (4) a 9 mm shell casing that was fired from the same gun that fired the shell casings found at the scene of the shooting. Further, the State presented several 9 mm bullet fragments that were removed from Lukie and McDuffie. Finally, the State presented incriminating statements Hall made while in jail. Hall claimed he had been in control of Clark's car "24/7" since he began "talking to her," said he had wiped down the interior of Clark's car, and talked about cleaning and disposing of shoes when his mother told him to "talk in code." We conclude beyond a reasonable doubt the trial court's error did not contribute to the jury's verdict; thus, it was harmless. Accordingly, we affirm as to this issue.

## II. LWOP Sentences

Hall asserts the trial court erred by enhancing his sentences to LWOP pursuant to the recidivist statute. We address his two arguments in turn.

### A. Insufficiency of Transfer Order

Hall contends his ABWIK conviction should be construed as a juvenile adjudication because the family court failed to make adequate findings of fact pursuant to *In re Sullivan* before it transferred that case to general sessions court. We disagree.

Under the recidivist statute, a defendant convicted of a most serious offense must be sentenced to LWOP if that defendant was previously convicted of another most serious offense. § 17-25-45(A)(1)(a) (2014). Murder, attempted murder, and ABWIK are all statutorily defined as most serious offenses. § 17-25-45(C)(1) (Supp. 2021). Guilty pleas are considered convictions, § 17-25-45(C)(3) (2014),

but "a juvenile adjudication is not a conviction under the mandatory LWOP provisions of the recidivist statute." *State v. Green*, 412 S.C. 65, 84, 770 S.E.2d 424, 434 (Ct. App. 2015) (citing *State v. Ellis*, 345 S.C. 175, 179, 547 S.E.2d 490, 492 (2001)).

"The family court has exclusive jurisdiction over children who are accused of criminal activity." *State v. Pittman*, 373 S.C. 527, 558, 647 S.E.2d 144, 160 (2007) (footnote omitted); *see* S.C. Code Ann. 63-3-510 (Supp. 2021). However,

> If a child fourteen, fifteen, or sixteen years of age is charged with . . . a felony which provides for a maximum term of imprisonment of fifteen years or more,[11] the court, after full investigation and hearing, may determine it contrary to the best interest of the child or of the public to retain jurisdiction.

S.C. Code Ann. § 63-19-1210(5) (Supp. 2021). "The court, acting as committing magistrate, may bind over the child for proper criminal proceedings to a court which would have trial jurisdiction of the offenses if committed by an adult." *Id.* "[W]hen a juvenile is tried and adjudicated as an adult . . . in general sessions court, the guilty plea is a conviction for purposes of the recidivist statute." *Green,* 412 S.C. at 84, 770 S.E.2d at 434 (citing *State v. Standard*, 351 S.C. 199, 203, 569 S.E.2d 325, 328 (2002)).

Further, "in South Carolina, a guilty plea constitutes a waiver of nonjurisdictional defects and claims of violations of constitutional rights." *State v. Rice*, 401 S.C. 330, 331-32, 737 S.E.2d 485, 485 (2013). "[A]n error in a waiver proceeding which does not deprive the adult court of jurisdiction over criminal proceedings involving a juvenile can be waived if the juvenile pleads guilty." *Id.* at 333, 737 S.E.2d at 486. "[A]n erroneous order transferring a juvenile to general sessions court . . . [is] a judicial error—not a jurisdictional error." *Id.*

---

[11] ABWIK was a felony codified in section 16-3-620 of the South Carolina Code (2003) (repealed 2010) and was punishable by a maximum of twenty years' imprisonment. *State v. Fennell*, 340 S.C. 266, 275, 531 S.E.2d 512, 517 (2000).

Additionally, "a party aggrieved by an order, judgment, sentence[,] or decision may appeal." Rule 201(b), SCACR. "[A]n aggrieved party is one who is injured in a legal sense . . . ." *State v. Cox*, 328 S.C. 371, 373, 492 S.E.2d 399, 400 (Ct. App. 1997). A PCR application is the exclusive method for collateral attack upon a conviction. *See* S.C. Code Ann. § 17-27-20(B) (2014).

In *State v. Atkins*, the defendant contended on his consolidated direct appeal and resentencing trial for his murder conviction that his previous murder conviction was invalid because he had received ineffective assistance of counsel. 303 S.C. 214, 216-18, 399 S.E.2d 760, 761-62 (1990). Our supreme court noted that previous murder conviction had "not been reversed or set aside" because his PCR application had been dismissed and his petition for certiorari had been denied. *Id.* at 218, 218 n.1, 399 S.E.2d at 762, 762 n.1. Our supreme court concluded the defendant's resentencing trial was not the proper forum to attack the validity of his previous conviction. *Id.* at 218, 399 S.E.2d at 762.

In *Green*, the defendant had been tried and convicted as an adult for a "most serious offense" he committed as a juvenile; he was convicted of a second "most serious offense" as an adult and received a mandatory LWOP sentence pursuant to the recidivist statute. 412 S.C. at 74-75, 85, 770 S.E.2d at 429-30, 435. This court affirmed the defendant's mandatory LWOP sentence and reasoned the defendant's previous conviction for an offense committed as a juvenile was nevertheless "a 'conviction' for purposes of [the recidivist statute]" because he "was tried and adjudicated as an adult." *Id.* at 84-85, 770 S.E.2d at 435.

Here, the trial court did not err by enhancing Hall's sentences to LWOP pursuant to the recidivist statute. First, like the defendant in *Atkins*, Hall's ABWIK conviction is still valid. In 2018, Hall filed a PCR application challenging his 2011 ABWIK guilty plea, but that action is still pending. *But see* § 17-27-45(A) (2014) ("An application for relief filed pursuant to [the Uniform Post-Conviction Procedure Act] must be filed within one year after the entry of a judgment of conviction or within one year after the sending of the remittitur to the lower court from an appeal or the filing of the final decision upon an appeal, whichever is later."). Thus, Hall cannot collaterally attack the validity of his ABWIK conviction on this appeal for his murder and attempted murder convictions.

Further, like the defendant in *Green*, Hall was tried and adjudicated as an adult for his ABWIK conviction. Because Hall was tried and adjudicated as an adult, his

ABWIK conviction required LWOP sentences for his subsequent murder and attempted murder convictions under the recidivist statute. Indeed, Hall cites no authority in which a court has treated an adult conviction as a juvenile adjudication under the recidivist statute. Consequently, Hall's contention that his ABWIK conviction should be construed as a juvenile adjudication has no merit, regardless of the sufficiency of the family court order transferring him to general sessions court. *See Green*, 412 S.C. at 84, 770 S.E.2d at 434 ("[W]hen a juvenile is tried and adjudicated as an adult . . . in general sessions court, the guilty plea is a conviction for purposes of the recidivist statute."); *Atkins*, 303 S.C. at 218 n.1, 399 S.E.2d at 762 n.1 ("[T]he fact that [the defendant] may be allowed to collaterally attack the prior conviction in another forum does not entitle him to relief unless and until the conviction is invalidated."); *see also Rice*, 401 S.C. at 333, 737 S.E.2d at 486 ("[A]n error in a waiver proceeding which does not deprive the adult court of jurisdiction over criminal proceedings involving a juvenile can be waived if the juvenile pleads guilty."). Thus, the trial court properly enhanced Hall's sentences to LWOP pursuant to the recidivist statute.

## B. Eighth Amendment Violation

Alternatively, Hall argues his mandatory LWOP sentence enhancements due to his ABWIK conviction violate the Eighth Amendment's prohibition on cruel and unusual punishment because he was a juvenile when he committed that ABWIK offense. We disagree.

"[O]ur appellate courts have rejected the argument that it is cruel and unusual punishment to use prior convictions for offenses committed as juveniles for sentencing enhancement under [the recidivist statute]." *Green*, 412 S.C. at 86, 770 S.E.2d at 435. Accordingly, "an enhanced sentence based upon a prior most serious conviction for a crime which was committed as a juvenile does not offend evolving standards of decency so as to constitute cruel and unusual punishment." *Standard*, 351 S.C. at 206, 569 S.E.2d at 329.

In *Miller v. Alabama*, the Supreme Court held that mandatory LWOP sentences for juveniles violated the Eighth Amendment. 567 U.S. 460, 479 (2012). In *Green*, the defendant argued his mandatory LWOP sentence "would violate the Eighth Amendment's ban on cruel and unusual punishment because he was a juvenile" when he committed the offense that subsequently required his mandatory LWOP sentence. 412 S.C. at 75, 770 S.E.2d at 429. The *Green* court found the

defendant's reliance on *Miller* was misplaced because, unlike the defendant in *Miller*, he was not a juvenile when he committed the offense that resulted in his mandatory LWOP sentence. *Id.* at 86-87, 770 S.E.2d at 436. This court reasoned that because "*Miller's* holding was based, in part, on the 'recklessness, impulsivity, and heedless risk-taking' of children[,] . . . the policy considerations from *Miller* [we]re inapplicable." *Id.* at 87, 770 S.E.2d at 436. Consequently, the *Green* court ruled the defendant's mandatory LWOP sentence enhancement due to his previous conviction for an offense he committed as a juvenile did not violate the Eighth Amendment. *Id.*

Therefore, Hall's contention that his LWOP sentence violated the Eighth Amendment has no merit. Like the defendant in *Green*, Hall was tried and adjudicated as an adult for his ABWIK conviction. Critically, like the defendant in *Green*, and unlike the defendant in *Miller*, Hall was not a juvenile when he committed the offense that resulted in his enhanced LWOP sentences. Moreover, a panel of this court cannot overrule a decision by another panel. S.C. Code Ann. § 14-8-210 (2016) ("The decisions of a panel of th[is] court . . . shall be final and not subject to further appeal, except by petition for review or by other exercise of discretionary review by the Supreme Court."). Thus, Hall's mandatory LWOP sentence enhancements due to his ABWIK conviction did not violate the Eighth Amendment. Accordingly, we affirm Hall's LWOP sentences.

**CONCLUSION**

The trial court erred by failing to admit into evidence the Snapchat messages between Elmore and Jackson, but that error was harmless in light of the messages' limited probative value and the overwhelming evidence of Hall's guilt. Additionally, Hall's sentences for murder and attempted murder were properly enhanced to LWOP pursuant to the recidivist statute because Hall was tried and convicted as an adult for ABWIK, that conviction is still valid, and he cannot collaterally attack the validity of that ABWIK conviction on this direct appeal for his murder and attempted murder convictions. Finally, Hall's mandatory LWOP sentence enhancements did not violate the Eighth Amendment's prohibition of cruel and unusual punishment because Hall was tried and convicted as an adult for ABWIK, and he was not a juvenile when he committed the offense that resulted in his mandatory LWOP sentence enhancements. Accordingly, Hall's convictions for murder, and attempted murder are

**AFFIRMED.**

**HILL and HEWITT, JJ., concur.**